**HIGHWAY INS. UNDERWRITERS v.
LUFKIN–BEAUMONT MOTOR
COACHES, Inc.**

No. 4482.

Court of Civil Appeals of Texas.   Beaumont.
Sept. 22, 1948.

Rehearing Denied Nov. 12, 1948.

Second Petition for Rehearing Denied
Dec. 30, 1948.

Dave Marcus, of Beaumont, for appellant.

Collins, Dies, Williams & Garrison, of Lufkin, for appellee.

WALKER, Justice.

This action was brought by appellee, the named Insured in a public liability policy issued by appellant, against the appellant to recover the amount of a judgment which

had been rendered against appellee in an action for damages for personal injuries by one Riley Alexander. We refer to appellee hereafter as Insured and to appellant, as Insurer. The present action was occasioned by Insurer's refusal to accept Alexander's offers to compromise and settle his action against Insured for a sum within the limits of the policy held by Insured, as will hereinafter more fully appear. After Alexander's offers were rejected, judgment was rendered against Insured for $6,000 more than the sums contracted to be paid in said policy, and Insured, having paid the full amount of the judgment, brought this action to recover the sum paid out, with interest thereon from the date the payment was made. The petition asserts, in effect, two causes of action, one for the sums contracted to be paid and one (in tort) for the excess of the judgment above those sums; but Insurer has not denied the contractual liability and the issues made in the present action are limited to the cause of action in tort, for the excess. The duty and standard of care invoked by Insured are those declared in G. A. Stowers Furniture Company v. American Indemnity Company, Tex.Com.App., 15 S.W.2d 544. We have limited our discussion to the cause of action in tort.

Insured is, and was at all times referred to herein, a common carrier for hire, operating motor busses for the carriage of passengers over a route extending from Lufkin to Beaumont.

On the night of April 13, 1943, between 11:00 and 12:00 o'clock, Insured's bus, bound for Beaumont, collided with the aforesaid Riley Alexander upon the public highway while he was attempting to repair his automobile and injured him severely. The collision occurred at a place between Woodville and Kountze, way stations on Insured's route. About the first of the year 1944, Riley Alexander brought suit against Insured in the District Court of Hardin County to recover damages for the injuries he had sustained. He alleged that Insured had been negligent in the operation of the bus at the time and place of the collision, and prayed recovery of $65,000 in damages.

Insured's policy insured it against loss from Alexander's injuries—to the extent of $5,000 only. This policy also bound Insurer to defend Alexander's suit against Insured, at its own expense, and to pay other items of expense which were incidental to a judgment against Insured and to an appeal from that judgment. Insured could not compromise and settle Alexander's action, without Insurer's consent, except at its own expense. The relevant provisions of the policy need not be quoted; they made applicable to Insurer, in considering Alexander's offers of settlement, the duty and standard of care declared in the Stowers Furniture Company case.

Insured notified Insurer of the collision between its bus and Alexander, and later notified Insurer of the action for damages brought by Alexander. Insurer, acting under the aforesaid policy, assumed control of the defense of Alexander's action, selected counsel to defend the action in behalf of Insured and paid these counsel for their services, and the counsel selected filed answer in behalf of Insured and defended Insured upon the trial of Alexander's action in the District Court of Hardin County and in the appellate courts. No other counsel represented Insured in Alexander's action, and there is no evidence that Insurer ever suggested that Insured procure other counsel.

Alexander's action for damages came on for trial in the District Court of Hardin County on May 31, 1944, before the court sitting with a jury. Special Issues were submitted to the jury and a verdict was returned on June 6, 1944, assessing Alexander's damages at $11,000, over twice the amount of Insured's policy. On June 7, 1944, the trial court rendered judgment in behalf of Alexander against Insured for $11,000. Insurer then took an appeal to this Court of Civil Appeals in Insured's name, but this Court affirmed the trial court's judgment on June 7, 1944,[1] and later, in due time, the Supreme Court refused an application for a writ of error to this Court's judgment.

---

[1] Opinion not designated for publication.

Several offers of settlement were made by Alexander's counsel to both Insured and Insurer during the course of the trial of Alexander's case. The first of these offers was made to Morris McMullen, who attended the trial as a representative of Insured and who testified that he was Insured's traffic manager. What authority he had from Insured was never fully proven; there is no evidence that he had authority from Insured to compromise and settle the Alexander suit (he denied that he had the authority) or to approve in Insured's behalf of Insurer's conduct of the defense of that suit. There is some dispute regarding the exact sum required in this offer, but it was at least within the limits of Insured's policy. Insured was represented by two lawyers at the trial of Alexander's case and Mr. McMullen referred this offer of settlement to the leading counsel of the two, for Insurer's consideration. This was in strict accord with the policy, under which a settlement by Insured, without Insurer's consent, was at Insured's expense. Later, Alexander's counsel made offers to the same lawyer to whom we have referred as Insured's leading counsel, to compromise and settle the case for $4,500, which was $500 less than the amount of the policy, and the lawyer to whom this offer was made referred it to Insured's claims manager, the authorized and responsible officer of Insurer, for acceptance or rejection. The claims manager rejected it. There is evidence (and none to contradict it) that this officer acted upon the opinion of the two lawyers defending Insured, who thought that they would either win the trial or would bring recovery below the policy limits. There is also evidence that the claims manager, before he acted, was informed that Mr. McMullen approved of this course, but McMullen denied that he approved, or that he expressed an approval, of this course of action, and the conflict was not put to the jury. Nor, indeed, was the ground upon which the claims manager acted. We have referred to the absence of evidence that McMullen had authority from Insured to give Insured's consent to the refusal of offers of settlement. There is no evidence tending to show that In-

sured ever approved Insurer's rejection of Alexander's offers.

This offer of settlement for $4,500 was repeated during the trial. Alexander's counsel communicated it to one of Insured's present counsel, who, in Insured's behalf, then communicated it to the lawyer to whom we have referred as Insured's chief counsel, and brought to the attention of this lawyer Insured's limited protection under the $5,000 policy. The offer was made again after all of the evidence had been introduced, and before the charge was submitted to the jury; it was rejected, apparently by the lawyer of Insured to whom it was made.

It is not in evidence that Insured ever demanded or requested Insurer to accept the offer of settlement.

After the trial court's judgment became final, Insured demanded that Insurer pay it in full; it then amounted to $11,679.79. Insurer, however, refused to pay more than the amount of the policy, to-wit, $5,000, and costs and interest on the judgment, leaving Insured to pay the balance, amounting to $6,000. Insured then paid the entire judgment, in the sum stated. Insurer afterwards offered to pay to Insured the sum previously offered, namely, policy limit, costs and interest on the entire judgment; but Insured refused to accept this offer and brought suit for the entire amount paid out in satisfaction of the judgment, claiming that Insurer was obligated to pay it all.

The trial pleadings of Insurer and Insured need not be described in detail. Insured alleged that Insurer was negligent in refusing to accept Alexander's offers of settlement. These allegations Insurer denied, pleading that Insurer rejected the offers in good faith, with due care.

The cause was tried to the court sitting with a jury, and the evidence adduced on the trial of Alexander's case was read to the jury on the trial of this cause.

Only one Special Issue was submitted to the jury, which with the jury's answer thereto, reads: "Do you find—that a person of ordinary prudence in the exercise of such degree of care as such a person would use in the management of his own

business, would, under the facts and circumstances known to the—Highway Insurance Underwriters, or to its attorney who represented the defendant, Lufkin-Beaumont Motor Coaches, Inc., in said suit so brought by Riley Alexander against it, prior to the rendition of the jury's verdict in said case, have settled said case by paying said Riley Alexander the sum of $4,500.00? Answer: Yes."

Pursuant to the jury's verdict, the trial court rendered judgment in behalf of Insured against Insurer for $11,679.79, together with interest thereon from the date that sum was paid out by Insured, namely, May 29, 1945; and from this judgment Insurer took this appeal.

The principal question raised on this appeal is whether there is any evidence to support the jury's finding that Insurer was negligent in refusing the offers to compromise and settle Alexander's case for $4,500, and we will therefore state the relevant portions of the evidence introduced in the trial court. This evidence relates to two basic issues, namely, that of Insured's liability in damages for Alexander's injuries, and that concerning the extent of Alexander's damages. The proof relevant to the latter issue is stated first.

(1) *Damages sustained by Alexander:* This issue was not disputed in the proof by the parties. The relevant testimony given in behalf of Alexander was not contradicted in any material respect. All of the evidence of any weight whatsoever concerning the nature, extent and probable duration of Alexander's injuries and the probable effect of those injuries upon Alexander's earning power which was introduced upon the trial of Alexander's case was proven by Alexander and by witnesses called by him to the stand, namely, his wife and Dr. Beazley, his attending physician.

It is evident that no defense to Alexander's claims could be made.

The evidence adduced in behalf of Alexander showed that Alexander was a relatively young man with a life expectancy in excess of thirty years, that he had little education and no means of earning his livelihood except by manual labor, that he was seriously injured when the bus struck him and that these injuries had permanently disabled him from procuring gainful employment except in cases where he could act as an independent contractor. According to this evidence, he was, to all intents and purposes, totally and permanently disabled to work and earn money in the occupations he had followed before his injury occurred. The relevant testimony was as follows:

The bus which struck Alexander was large and heavy. The operator of the bus thought that it was about 8 feet wide and about 20 feet long, and that it carried 22 passengers.

According to some of the passengers on the bus, the vehicle was moving at a speed variously estimated as low as 25, and as high as 35 miles per hour. There was other evidence that the speed of the bus was much higher.

Alexander was struck on the right side by the bus as he stood beside his own automobile, stooping over to repair it. The force of the blow drove his body down the highway for a short distance, and caused him to lose consciousness at least temporarily.

He remained at the scene of this incident without treatment for what must have been a considerable time. The witnesses estimated this period of time differently, but all of the evidence on the point shows that Alexander was removed in an ambulance which came from Silsbee, and he was injured upon the highway at a point some 12 miles beyond Kountze, through which the ambulance from Silsbee had to pass. It was in evidence—and this evidence was not contradicted—that Alexander's brother-in-law Lilley procured this ambulance to come to the scene of the injury by a telephone call which he made from Kountze, after he had driven Alexander's automobile from the scene of the injury to Kountze. Estimates of an hour intervening between the time Alexander was hurt and the time he was removed in the ambulance were the most convincing of those proved.

Alexander was injured on Tuesday night, April 13, 1943. He was conveyed in the ambulance to Hotel Dieu hospital in Beau-

...ont, and he remained there until the following Sunday; on that day he was conveyed in an ambulance from the aforesaid hospital to his father's home, some three miles from Silsbee.

He was confined to his bed at his father's for some 90 days, and according to his wife, remained at his father's home some time longer, until the latter part of August. Then he and his wife returned to their own abode, where they resided when Alexander's case was tried. They first settled in the automobile trailer in which they lived when Alexander was hurt, but not long before the trial of Alexander's case, a small house was erected into which they moved. This is referred to in the evidence once as about half as big as a box car.

Alexander testified that he had sustained broken bones in his pelvis and in each of his legs below the knee, with some flesh wounds. At the trial in June, 1944, some 14 months after the injury, he testified that he did not have normal use of his right foot, that his left knee was stiff and he could not straighten his left leg, that one of his fingers was stiff and that a popping noise occurred in his right leg when he moved it; all of these resulted from his injury. He testified further that under the orders of his attending physician, Dr. Beazley, he was wearing, and had worn for some time, an elastic girdle about his pelvic region, to support his hips and body; that he suffered pain in the middle of the back and in the left knee, and that walking any distance caused him to suffer pain in his hips and back. He testified that his sleep was interrupted and that he was compelled to arise 4 or 5 times a night to void his kidneys. He testified that he was nervous, that he constantly suffered pain, and that his condition had not improved during the past 6 months. He also testified that he did not limp before the occurrence of his injury (Dr. Beazley testified that Alexander had a "decided" limp.) All of these effects he attributed to his injury; he had not suffered from them before that occurred.

Alexander testified further that he could not do manual labor. He had fallen several times, apparently because his knee and pelvis would not support him, though whether this only occurred while he was at work is not clear. "Every couple of days I have to just lay around." He testified further that it was necessary for his wife or some one to stay with him most of the time, to help him.

From his testimony, it appears that he was 33 years old when injured by Insured's bus, and it was otherwise shown that his life expectancy at the time his case was tried exceeded 30 years; that he was married and had been for about 4 years before he was injured; that his formal education ended in the 8th grade; and that he earned his living by manual labor. He had been a farmer when a boy, and had worked as a carpenter. At the time he was injured he was employed as a riveter in an aircraft plant at Fort Worth, with an average daily wage of about $6.40; and he had returned to his home near Silsbee in response to an order of his Draft Board, for examination.

He had done no work of any importance since his injury. He had made $25 or $30 manufacturing some rings, and had sawed the rafters which were used in his house.

He testified to two previous injuries. One of these had occurred in 1939, about 4 years before the injury for which he sued Insured, and the other had occurred at a time not definitely proved ("several years ago"). He said that for the injury first mentioned he drew about $50 in workmen's compensation payments and for the other, about $85.00. There was no evidence that either injury was serious; according to such evidence as the record contained, each of these injuries was temporary and was not serious, and he had recovered from each before he was hurt on April 13, 1943. He had failed to mention one of these injuries (to his shoulder) when his deposition was taken (about 5 months before trial of his case) but explained this omission by saying that he had forgotten it; he first mentioned the omitted injury himself, on trial. He made no complaint of this shoulder during the trial of his case.

Mrs. Alexander confirmed her husband's testimony in several respects which need

not be mentioned. She testified that she stayed with Alexander and attended him while he was at his father's; "I had to." She said there were "several things to do for him. He couldn't roll over at the time we were there. He couldn't roll over, he couldn't move his legs or anything; so I had all that to do and he was in so much misery until I would have to rub his back and legs, and things like that, with liniment, and put hot poultices on him, and give him tablets to ease him. And—Oh, just a number of things that you would do, like that. Q. Did he appear to be in pain during any of that time? A. He certainly did." After they returned to their own home, she continued to care for her husband, and still did at the time of trial. "He complains and at times, if he tries to do anything—sometimes he will think he will try to do something—maybe he can but when he tries it, his back or hip, or something, throws him and I have to pick him up and carry him in the house with whoever is there to help me. And sometimes he stays in bed 3 or 4 days, or a week, and sometimes he can't roll over, he is so sore and hurts so bad."

She said that she did the household chores and attended to some cattle they had.

She said that she and her eldest brother had erected the little house they occupied at the time of the trial, adjoining the place where the trailer had been. "Q. Who actually did the manual labor in building that house? A. I did. Q. Anyone else to help you? A. My—oldest brother. * * * He just worked on the days that he would be off work, or on Sundays." She said that her husband did no work on this house other than saw the rafters.

She testified that Alexander had been in good health and had been gainfully employed from the time they married (in 1938) until he was injured (in 1943), but that since the injury "He couldn't work and I have had to do what was done. He couldn't make any money anyway." She said that her husband had tried to nail some boards on the house but "he fell and he couldn't so he had to quit." He had also attempted to repair an oil stove, but had failed because he was too nervous.

She testified that Dr. Beazley first saw her husband during May, 1943, and that he had seen her husband several times altogether. She roughly estimated at a dozen the number of these occasions.

Dr. Beazley said that he first saw Alexander during the Spring, about May, of 1943, and his recollection was confirmed to some extent by the date of his first X-ray of Alexander which was dated May 18, 1943. Alexander, Dr. Beazley thought, was then at his father's home. Dr. Beazley found Alexander "lying in the bed with considerable wasting about his body, and unable even to get up—get out of bed." Alexander complained of pain at the time. "I gave him some sedatives, and, from the history of the case, I instructed him to remain in bed for a longer time—I think a week or two—until a better union could take place. And then I would X-ray him, to ascertain just what should be done for him."

He said that he later X-rayed Alexander (on May 18, 1943, a little over a month after the injury), and he described Alexander's injuries as follows: "Well, there was a break to each of the small bones on the outside of each leg * * * each bone * * * about two inches from the top * * * was broken, what we call fractured. It was more or less splintered in one side * * * I think the left. But, now, these bones were broken * * * not a straight break like a saw would make, but broken like you would a stick." Regarding the knee joint, "it was discovered * * * a little later, that this joint was also bruised and hurt and injured in some way, he was unable to have proper motion in this knee." Referring to the pelvis, he described it as consisting of three separate bones which "make up what we call the girdle. In one of these sections (that, he later said, on Alexander's right side) there was a distinct fracture all the way through, of one of these thirds * * * this third had a fracture right through, in this position (indicating)." That was in the region of the groin, on the right side, in the right leg. This bone in the pelvis was "just broken like you would a stick. It is not a straight break, but a fracture like a stick. Just take

a stick and break it and it don't break like sawing it in two, but breaks with a lot of little prongs in it. Q. Yes, sir. A. And that was about the distance that break covered, somewhere about two inches, whereas a saw, you know, just makes a little small break." (We construe this testimony as showing, not the length of the break but roughly the thickness, the surface area of the break between outer and inner walls of the bone). He described that bone as a very strong bone; "I would call it the seat of the back bone."

He had recently (two days before he testified in June, 1944, some 14 months after the injury) made another examination of Alexander and described his findings as follows: "The hip and the knee (it was the left knee) is flexed, what we call flexed, or bent about this much (indicating). I don't think he can straighten it, because I put a pretty good deal of weight, pressure on it myself a day or two ago (he had hung a 40 pound weight on the left leg) trying to push it back straight. It won't go back. He has more or less, what we call ankylosis * * * means anchoring or fracturing of the bones in an abnormal position." This, he thought "could be straightened out but, if you straighten it, I would feel you might have a worse condition after you got through straightening it because, if you straighten it, most likely it would remain straight and not able to move, at all." He explained the cause of this condition. "That knee unquestionably received a severe blow of some kind, so much so that in the bruising and the recovering of that there was some scar tissue in some of these ligaments supporting the knee joint." Such scar tissue, he said, would not stretch. "You can break it and cut it but it is not flexible like it used to be." He thought that the ligaments and tendons in the region of this knee had been injured and were probably "torn loose from the anchorages to the bones." In his opinion there had been an ossification of this joint. He said, further, that "chances were against" the condition of this knee improving; " * * * but this one, having gone a year and instead of getting better, it is a little worse now than it was to begin with, I would say

the chances are against it. Q. * * * Chances are more likely it will grow worse than better. Is that it? A. Yes, sir, because it hasn't already been loosened up." Further, he said, the condition of this knee made more probable a future invasion of rheumatism.

Concerning Alexander's hip, he testified, in effect, to the opinion that the blow received by Alexander had injured the ligaments, tendons and cartilages enclosing the hip joint. He had also examined this hip recently (evidently on the occasion two days before testifying). "Q. (Did he find) any looseness or lack of proper function in that right hip? A. We have to take that from the man, because you can't pull the leg enough to stretch that ligament, you couldn't stretch it a quarter of an inch. * * * In motion, he doesn't seem to have the proper control of it. * * * When I have him to move one leg, like that, and then move the other like this, he doesn't have the proper control of this * * * I believe it is right * * * he doesn't have the proper control of the injured hip, like he has of the left. You see, I can't see inside there, and you don't dare cut in there. * * * Q. * * * Whatever condition is there, you don't think it would be remediable, but would be a permanent condition? A. Yes, sir." And it seemed to be his opinion that this hip was peculiarly liable to recurrent injury. Further, concerning this hip: "I know that bone (obviously the pelvic member he first referred to) was fractured and most likely the joint was loosened." He said again that the existing condition of the hip was probably permanent.

While exhibiting X-ray photographs taken recently, he testified that "There is infiltration of some kind of tissue there; an additional tissue has been thrown out in that original injury." This was inside the hip joint and "that would have a tendency to more or less ankylose or stiffen as time went on, basing my opinion on the fact there is some infiltration now, during the past year."

He testified that Alexander had a "decided" limp (Alexander had said that he did not limp before the injury); " * * * the legs don't harmonize." He said: "The

knee (referring to the left knee) is bent forward and to the left, or outside. That would throw the hip joint a little bit out of line, in its original socket. Would throw the hip joint out of line and dislocate his hip because the leg should be straight both ways, back and forth and lateral. It also has some bearing on the ligaments in this joint." Walking on these "uneven length legs" had a tendency to affect the pelvic region; " * * * it would be tilted a little bit. He would throw more weight on the right side." And the fact that the left leg was shorter would accentuate the defect in the right hip. (This testimony confirmed to some extent, and afforded a basis for the testimony of Alexander and his wife concerning Alexander's falls.)

His testimony also afforded some basis for relating Alexander's complaints of having to arise at night to the 1943 injury. He testified that this injury could have had something to do with that condition ("injured the nerves that supply sensations to the bladder").

He confirmed Alexander's statement that there was a noise in Alexander's right leg. This seemed to be in the region of the hip, and if it had not existed before the injury occurred (as Alexander said), he was inclined to attribute it to the injury.

His cross examination detracted little, if at all, from the testimony just stated. He testified that some employers did not require a physical examination. He testified: "Q. Now, you do not intend to leave the impression that this man will not be able to make a living in the future, do you? A. No, sir. Q. You do think he 'will be able to make a living, don't you, Dr. Beazley? A. Yes, sir." He had seen Alexander perhaps a dozen times since his first examination in May, 1943. He testified: "Q. * * * whether or not there will be improvement you are not in a position to say? Nor if so, how much? A. It is largely problematical. Q. And I believe you also said you were depending on his statement, principally, with reference to the trouble in the right hip? A. So far as pain is concerned." He said that the fractures he had found had grown together ("very good"). The fall Alex-

ander had had in 1939 could have had "considerable bearing" on Alexander's trouble in his right hip (on redirect examination, when his attention was directed to evidence that Alexander had worked regularly since this 1939 injury, he gave it as his opinion that Alexander had fully recovered therefrom. The matter, in any event, was no defense to Alexander's claim). He testified to treating Alexander for a disease which Alexander did not mention (but did not say when, nor that the disease was serious. The disease was not shown to have had any relation to the consequences of Alexander's injuries, and from such evidence in the record, was immaterial to the injury, except on the issue of Alexander's credibility, and on that issue, remotely). He said he had seen Alexander on one occasion since the injury of 1943, at Alexander's house, when the latter was under the influence of intoxicating liquor—in contradiction of testimony of Alexander on direct examination to which we have not referred. He testified: "Q. And there is no reason why he shouldn't do ordinary carpenter work now, is there, Doctor? A. No, sir."

He testified further on cross examination that Alexander had not paid him for his services.

On redirect examination, Dr. Beazley made it plain that he considered Alexander permanently disabled to work and earn money except under unusual circumstances. He testified:

"Q. * * * He (referring to Alexander) is uneducated further than the 8th grade in school; that is, he is not able to do any office work; dependent wholly on common labor work, which means physical exertion, working in industrial plants, and so forth, and so on, and their requirements, with which you are familiar. Now in view of that, do you think he is capable of obtaining and holding industrial employment of that nature, to make a living? A. He would have to be his own employer. On a farm, or other work * * * As was brought out here, a while ago, some companies do not require examination. * * * You might be * * * might go to one of those companies and take him without an examination. * * *

"Q. (Did he) think it would be safe at all for him (Alexander) to work in an industrial plant, handling machinery, or places where you have to do physical exertion, lifting or anything of that kind, or places where you have to climb up on houses in carpenter work? A. He couldn't do it a hundred percent, no, sir; he might make a shift at it, but he couldn't do good work. It would be dangerous to himself, as well as to those who were employed about him.

"Q. I believe you have already testified that you wouldn't pass him for industrial employment, yourself? A. That's right.

"Q. So, then, if he were able to make any living, he would have to figure him out a farm he could work on or something of that kind, and he his own employer, is that your testimony? A. Yes, sir.

"Q. You think with the hip, for example, that the stiff knee and crooked knee, in the shape it is in, he can get up and plow up and down the field, and farm? A. He would until that hip got to hurting him, and then he would quit. * * *

"Q. And his capacity to obtain and retain employment has been, has it not, greatly diminished by this accident? To say the least of it? A. In his present condition, yes, sir. * * *

"Q. * * * I believe you testified that this physical condition that you find him in now, after more than a year, is not likely to improve, but may grow worse? A. It is possible, yes, sir. * * *

"Q. * *] * From your knowledge of this case, and this physical examination of the man and his condition now, is it probable that the condition may grow worse until he becomes totally incapacitated? A. I don't think he will ever be totally incapacitated. You know, that means a whole lot, when you say total.

"Q. Well, you mean bed-ridden when you use the term total, don't you? * * * A. Mighty near it.

"Q. But I mean from the standpoint of obtaining and retaining employment of any kind to earn. * * * A. He is not going to get any better. * * * And the probabilities are that, as time goes on, and he gets older, he is going to suffer more from those injuries than he does now.

"Q. Do you mean that from the standpoint of pain? Or incapacity standpoint? Or both? A. Both.

"Q. You think those injuries will become more painful as he grows older? A. Yes, sir."

The only evidence which was offered in behalf of Insured to contradict this mass of testimony consisted of excerpts from a deposition of Alexander's, taken some five months before trial, and from a deposition of a Dr. Fowler who examined or treated Alexander for an injury in 1939 which was evidently that referred to by Alexander in his own testimony. There was nothing in these depositions to seriously detract from the showing of injury made by the evidence of Alexander and his witnesses. Alexander did testify on deposition to a somewhat higher hourly wage rate than he testified to on trial. He also said on deposition that he had received only one injury prior to that he had sustained on April 13, 1943, but this matter has been discussed. He also said on deposition that the worst of his trouble was through his back and hips and that the longest distance he walked was about "a quarter" (presumably a quarter of a mile, 440 yards, or about 4½ city blocks).

On the face of such testimony, looking to the black and white of the record alone, as we are compelled to do, it seems to us that Insurer ought reasonably to have anticipated that the jury trying the Alexander case would, in all probability, assess Alexander's damages at a sum substantially higher than the $5,000 limit of Insured's policy. The testimony in behalf of Alexander is convincing. Dr. Beazley confirmed Alexander and Mrs. Alexander, and Beazley was not impeached; and it seems that if Alexander was entitled to any damages at all, he was entitled to heavy damages.

(2) *The Issue of Liability*: We are thus brought to consider the record made on the issues which determine Insured's liability in damages for Alexander's injuries.

The pleadings and the trial court's charge which were filed in Alexander's case need not be discussed.

On the proof, the fundamental issues were simple and were limited to two questions, namely, (a) whether Alexander and his automobile were completely off, and a short distance beyond, the paved and main-traveled part of the highway, as he said, or were upon the pavement, in the right-hand traffic lane down which Insured's bus was lawfully proceeding, as Insured said; and (b) whether the headlights and rear light or lights, upon Alexander's automobile were burning brightly, as he said, or were not burning at all, as Insured said. The existence and solution of other questions of fact depended, in the first instance, on how the jury answered these two.

Alexander's proof relevant to these issues was consistent in all material respects, and was adduced from witnesses who had an opportunity to be fully informed about the matters concerning which they testified, and who were not impeached except as the contradiction of them by Insured's witnesses may be regarded as impeachment. Alexander's witnesses were Alexander himself, his brother-in-law J. W. Lilley, Mrs. Lola Teel and Myrlen Creel, a boy some 16 or 17 years old who came upon the scene of the injury shortly after the injury had occurred. The first three persons named were present in or about Alexander's automobile when Alexander was hurt.

█ The proof shows that four persons other than the first three witnesses named were riding with Alexander and were present when Alexander was injured. Alexander did not produce these witnesses nor account for their absence, but they were not shown to be under his control and were as much subject to subpoena by one party to the case as by the other. Therefore no inferences are to be drawn in behalf of either party from the failure of these four persons to testify.

The principal witnesses in behalf of Alexander on the issue of liability were J. W. Lilley and Alexander himself. It may be said regarding Alexander, and in some sense of Lilley, his brother-in-law, that they were interested witnesses; Mrs. Teel and Myrlen Creel were not.

Alexander was injured between 11:00 and 12:00 o'clock on the night of April 13, 1943, at a point on the Kountze-Woodville highway some 12 or more, perhaps 17, miles from Kountze. Woodville was about 32 miles distant from Kountze.

Alexander's case was tried in the District Court of Hardin County. He was a resident of that county at the time he was hurt, and had been for many years before. His father also resided in that county. Alexander himself was employed when injured as a riveter in a Fort Worth aircraft plant and had returned home for a physical examination in response to an order of his draft board, as has been stated. His brother-in-law Lilley was born in Hardin County, but said that he had been reared in Polk County and had resided most of his life in that county near the Hardin County line. He was about 21 years old when Alexander was hurt and was in service in the U. S. Navy, as he was when Alexander's case was tried. Mrs. Lola Teel was a girl about 18 years old at the time Alexander was injured. When Alexander's case was tried her family lived in Kountze, the County Seat of Hardin County, but she, herself, lived in the community of Votaw. Myrlen Creel resided with his grandfather, near the place where the bus struck Alexander, which seems to have been just inside or beyond the border of Hardin County.

On April 12, 1943, the day before Alexander was hurt, J. W. Lilley went from his home in Polk County to visit his sister and brother-in-law at their residence some five miles from Silsbee on the Spurger road. He was on furlough at the time. He said that the next morning he drove Alexander's automobile into Silsbee (Alexander remained at home), and spent the morning calling on friends and acquaintances in that town. Alexander's automobile was a 1936 model Ford Coupe. It carried only one seat for passengers, but the top of the rear compartment could be lifted and kept in place by a latch of some kind, and persons willing to do so could ride in this compartment.

Lilley said that he returned to Alexander's residence about noon, and remained in company with his sister and brother-in-law until about 3:00 o'clock in the afternoon. Alexander's brother Herman came in during this period, and at about 3:00 o'clock Lilley, Alexander and the said Herman departed from Alexander's residence in Alexander's automobile on a journey to Lilley's home in Polk County. Lilley intended to remain there and his companions apparently intended to return home at once.

Their route ran through Silsbee and Kountze, on out the Woodville highway to the Camp Seale road, where it left the highway.

Alexander's automobile leaked water (Alexander said that the water pump leaked; Lilley, the radiator), and Lilley said they stopped in Silsbee and put some water in the radiator. Then they proceeded on towards Kountze, but about three miles from Kountze the left rear tire blew out, and they were compelled to stop and remove this tire. They had no spare tire and drove on into Kountze "on the rim" to a repair shop, where they left the tire to be repaired. Lilley seems to have driven the automobile to the place where the tire blew out, and Alexander, from that place to the repair shop in Kountze. Lilley thought that they arrived at this shop about 4:30 o'clock in the afternoon (around 4:00 o'clock, according to Alexander).

Because of other work, the operator of the shop was unable to complete the repairs upon their tire until late in the evening; Lilley said that they did not get the tire until about 11:00 o'clock that night; and they seem to have left Kountze immediately, or very shortly afterwards. The meanwhile they spent in Kountze, returning from time to time to the repair shop to find out what was being done to their tire. Lilley said that they walked around, that they ate a sandwich, that they spent a considerable time near a small tent show. While they were in Kountze they met some acquaintances of Alexander's, namely, Orland Walters and his sister Lois Walters, and Johnny Moss and his sister Mrs. Lola Teel, and persuaded these people to accompany them during the ensuing drive to Lilley's home and back. There are some conflicts in the testimony as to when and where and under what circumstances Lilley and his companions met these people and as to who invited them to accompany Lilley and his companions, but these inconsistencies are of little account. The circumstances were not calculated to impress such details on the memory of the actors; and Lilley was not acquainted with the people he met, nor Mrs. Teel, with Lilley and his companions, before that evening. Alexander's case was not tried until June, 1944, and after the lapse of such a time (over a year), differences of this sort among the witnesses ought reasonably to have been expected and for that reason, discounted.

These seven people left Kountze about 11:00 o'clock at night in Alexander's automobile and proceeded along the Woodville highway toward the Camp Seale road. Lilley, according to himself and Alexander, was driving. He, Alexander and the latter's brother Herman were in the front seat; the other four were in the rear compartment.

After they had gone for some distance the engine began to overheat, for lack of the water which had leaked out of it, and they began to look for water along the road. They passed the entrance to the Camp Seale road, apparently inadvertently, and continued for perhaps a mile without finding water. Then, at the suggestion of Alexander, they turned around and started back to a source of water which they had passed. As Lilley remembered, they stopped momentarily when they turned around, and Herman and Lois Walters changed places in the automobile. They drove back down the highway towards Kountze, passing the Camp Seale road again, and just after they did, the pedal on the floor of the automobile regulating the flow of gasoline into the motor became disconnected from some part of the machinery under the hood, and they were compelled to turn off the traveled part of the highway and stop. Alexander testified on deposition that the automobile was moved off the pavement by means of the hand throttle.

The highway at this point was paved, and the pavement was some 18 or 20 feet

wide, with a black line down the center; and the shoulders on either side of this pavement were rather wide and would carry an automobile in safety. These matters were undisputed.

Lilley said that he stopped Alexander's automobile—he had driven it from the time they left Kountze—at a place which was a good step, some three or four feet, from the pavement. The front of the vehicle was pointed towards Kountze, towards which they had been proceeding, and the vehicle was on the right side of the road.

The headlights on the automobile were burning brightly. Lilley said that he remained at the wheel, that Alexander got out of the automobile and walked around to the left side, and that he raised the hood and stooped over to repair the mechanism which had become disconnected. To aid him, Johnny Moss, who had gotten out of the rear compartment, stood in front of the left headlight, so that his body would reflect the light beneath the hood, and Lois Walters also got out of the automobile and stood near the front of the left front fender, between Moss and Alexander, watching Alexander's actions. Lilley said that Alexander was standing on the ground, off the pavement.

Lilley said that as they were in these positions, Alexander stooping over to repair his car, a short time after they had stopped, Insured's bus came up behind them at high speed, left the pavement, rolled on to the "gravel," struck Alexander but not the automobile nor any one else and carried Alexander a distance of perhaps 50 feet, and that Alexander finally fell off and rolled "a little" on the shoulder of the road. He said that Alexander fell upon the shoulder on the right hand side of the road and did not fall upon the pavement. "Q. You were looking straight ahead at all times? or in that direction? were you not? A. I was until I heard the bus hit the gravel. It came off the edge of the concrete and you could hear it, and the roar of the bus caused me to look back. The bus was right behind us at the time and looked like it would hit the car. Q. Was the bus off the concrete? A. Yes, sir, the wheels next to us. I heard them

hit the ground * * * the gravel." The bus proceeded on down the road a short distance (Lilley thought, about 100 yards) and stopped.

Lilley heard no horn sound at any time immediately before he heard the bus. He said that he got out of the automobile and ran to Alexander, and that Johnny Moss ran down to the bus. Alexander was unconscious at the moment, his clothes were torn and he was bleeding. Lilley and Herman straightened Alexander's body. Lilley said that the driver of the bus came up to them. "I don't know exactly what all was said, except I asked the driver what he meant by leaving the highway and hitting a man standing clear off on the dirt. He made no reply to that and told me to get an ambulance. Then I got in Riley's (Alexander's) car and went for the ambulance." He said another time that he wanted to take Alexander to the hospital in his automobile but that "they" wanted an ambulance; so he went to get one.

The inference is that Lilley left very shortly after the bus struck Alexander. He said that he drove Alexander's automobile to Kountze, using the hand throttle, and telephoned to Silsbee for an ambulance. He then proceeded on to Silsbee. The engine of the automobile became so hot that it would hardly run, and he stopped at a garage apparently on the outskirts of Silsbee and left the vehicle there. A stranger to whom he explained his plight carried him to Alexander's wife, whom he informed of the incident and then took him and Mrs. Alexander to the hospital in Beaumont to which Alexander had in the meantime been conveyed.

Lilley testified that the lights on Alexander's automobile were burning brightly at the time Alexander was struck. The taillight was burning when they left Kountze, and it was burning when he went to the rear of the vehicle to lower the top of the rear compartment, preparatory to driving on to Kountze—and this was very shortly after Alexander was hurt. In the meantime, he said, no one had "bothered" the lights. This testimony is confirmed by Alexander, and Mrs. Alexander testified that the headlights were burning on the preceding night, when they had gone "to

the show." Mrs. Teel, riding in the rear compartment, did not know whether the lights were burning at the time of the injury or not.

Lilley said that the lights on the bus were burning and that the bus operator should have been able to see them.

He said that the bus was moving at high speed, going very fast, when it hit Alexander.

He said that he saw no car pass, in either direction, while he sat in the stopped automobile, and that he would have seen one had it passed. On cross examination, he testified:

"Q. Immediately before the bus, immediately before you heard this, isn't it a fact that there was a car approaching from your front, coming from in the direction of Kountze? A. No, sir. There was no car ahead.

"Q. Meeting you? A. No, sir, no car meeting us."

Alexander said that one came by when or shortly before his own car stopped.

Lilley testified further that he drank no beer or intoxicating liquor on the 13th, in Silsbee or Kountze, and that neither Herman nor Alexander drank anything in Kountze. "—I didn't see them and I was with them. Q. Were you with Herman and Riley (Alexander) at all times while there, before you left? A. Yes, sir." He said that he heard no one curse at the scene of the injury.

Riley Alexander confirmed the testimony of Lilley, which we have just restated, in every material respect down to the time he was struck by the bus. Some of his testimony has been referred to. We need note here only this item of his testimony: "Q. Was it raining or dry at that time? (referring to the time of the injury). A. It was dry."

Mrs. Lola Teel had failed to take notice of many things and had forgotten many other matters; but she confirmed the testimony of Lilley and Alexander in one material respect. She was quite positive that Alexander's automobile was stopped off the pavement, although she didn't know how far it was from the pavement. This was a matter which she could hardly help knowing, since she said that she sat in the back of the automobile until Alexander "hollered" and then she jumped out and "went to see" what had happened.

At that time, she said, Alexander was "way down the road." She didn't know of anyone in Alexander's automobile having had anything to drink, and said that the bus didn't hit the automobile and further, that only Alexander was struck by the bus. She said that Alexander (and not Lilley) was driving the automobile when she met them, apparently at or not long before the party left Kountze; this involves some inconsistency with Lilley's and Alexander's testimony, but Mrs. Teel actually had no opportunity to see who was driving when they left Kountze—or, what is material— when the car stopped. She did not leave the vehicle until after Alexander was struck by the bus and her position in the rear compartment and the top of the compartment would seem to have interfered substantially with her view of the interior of the coupe, if the walls of the coupe did not.

The foregoing statement constitutes Alexander's proof in chief. He offered only one rebuttal witness, the boy Myrlen Creel, to whom we shall refer in due order.

The evidence offered in behalf of Insured was adduced from five witnesses, the driver of the bus and 4 of the passengers. None of these people appear to have been residents of Hardin County, where the case was tried. Two of the passengers, Baxter and Dykes, were acquainted with the four people who met Lilley and his companions in Kountze. These two passengers, Baxter and Dykes, sat in the front seats on the right hand side of the bus, while the other two, Stoker and Snowden sat on the opposite side of the bus, behind the driver but near him. Whether their seats were together or were not is not clearly shown. It thus appears that, of the passengers, Baxter and Dykes were best situated to observe what happened, and as will hereinafter appear, the testimony of both men was seriously impeached. Further, as will hereinafter appear, there was confirmation of some material details of the driver's statement in

the testimony of the passengers but statements were made by some of these four passengers, and conflicts arose between these five witnesses of Insured's, which affected the credibility of most of them and which, it may be believed, adversely affected the acceptability of the theory of facts propounded in behalf of Insured.

As has been indicated, Insured's and Alexander's evidence relevant to the fundamental questions of fact was in flat conflict.

The bus driver, John D. Boyett, was about 43 years old when Alexander was hurt. He had been employed by Insured for about two months before Alexander's injury, and until employed by Insured had not driven a passenger bus. He had had experience, however, in the operation of trucks and of a school bus.

Insured's bus was proceeding from Lufkin to Beaumont. It had passed through Woodville, and was on its way to Kountze. As the driver described it, the incident in which Alexander was injured resulted primarily from a cause referred to rather often in the reports. The driver thought that this incident occurred about 11:45 at night. He testified:

"A. Well, I was meeting a car.

"Q. A car was coming to meet you? A. Yes, sir. * * *

"Q. Right there had the car come and met you? got even with—the bus? or just passed the bus? A. Just passed the bus. Just as it passed I saw this car—

"Q. Then what did you do? A. Well, I saw this car and it didn't have any lights and I turned to pass it. To the left. I turned to the left to pass this car.

"Q. What happened then? A. I struck something * * * struck this man.

"Q. He rode the fender or front part of your car down a piece? A. No, sir.

"Q. Did he fall on the concrete or on the shoulder? A. Done so quick I couldn't tell.

"Q. When you went back, where was he? A. About 4 feet off the highway.

"Q. Lying down? A. Yes, sir."

He testified further, under examination by Insured's counsel:

"Q. Is it true that the thing that kept you from seeing the parked car on the pavement before you did was some blinding lights approaching the car? A. Yes, sir.

"Q. When those lights got out of your eyes, then you saw it? A. Yes, sir."

He thought that this occurred 16 or 17 miles from Woodville; anyhow, between 15 and 20 miles from that place.

He said that the night was dark and dry. He did not refer to fog.

He said that Alexander's automobile was stopped and that it stood wholly on the pavement, but near the right hand edge of the pavement. He said further that this automobile showed no lights at all.

He said that the bus had two head lights, that these were good lights, and that they were burning brightly at the time.

He thought that the bus ran down the road about 125 feet after striking Alexander before he stopped it. He later moved it farther off the main traveled part of the road, and said that he put out flares. (Only one other witness, Baxter, referred to these flares. Myrlen Creel had no recollection of them.)

He remained at the scene of the incident until the ambulance arrived and carried Alexander away.

He took the names and addresses of his passengers and furnished them to Insured.

He said that he made a report of the incident; he did not say to whom the report was addressed, but it was evidently made to Insured, his employer.

As hereinabove stated, he thought that the bus was about 8 feet wide and about 20 feet long, and that it would carry 22 passengers. He had never measured the length or width of this vehicle, however.

The salient facts to which the driver testified were these, namely, (1) Alexander's automobile was stopped on the pavement, in the bus' traffic lane, (2) at night, without lights, and (3) it was temporarily obscured from the driver's view by the lights of the approaching automobile. There was some confirmation by the passengers of the driver's testimony. Each of the four passengers agreed with the driver regarding Facts (1) and (2) and each of the

four referred to an approaching car. However, only two, Baxter and Snowden, referred to the intensity of the lights of the approaching automobile, which was the key element in Insured's theory of the facts. The descriptions which the four passengers gave of the incident conflict in many respects; some of these conflicts were such as normally arise under circumstances like those attending the occurrence of the incident, but other conflicts are not to be explained on this ground and constitute, instead, matters adversely affecting the acceptibility of Insured's theory of the facts. We will state the passengers' versions of how Alexander came to be injured.

*Baxter*, a log scaler, was about 36 years old at the time of the incident. He testified: "I saw the car just before the bus hit it. There was another car coming, meeting the bus, just before the bus hit it." He imagined that he was about 30 feet from it when he saw Alexander's automobile. He said that the approaching car had its lights on and that these lights bothered him. Alexander's automobile was "on the concrete" and he saw it just as the approaching car passed the bus. (On cross-examination, however, he testified, in effect, that the lights of the approaching car revealed Alexander's automobile to him.) He said that no lights showed on Alexander's automobile. When he saw that automobile in front of him, the bus turned to the left; before, it had been on its own side of the pavement. The bus struck Alexander practically in the middle of the highway, carried him down the highway "a little piece," and then threw him off of the right hand side about 15 feet from the pavement. He said also that the bus hit the automobile on the left rear side and drove it down the road about 15 feet. He professed to have been the first person to leave the bus and that when he got back to the scene of the injury, this automobile had been put off the pavement. He said that immediately before this incident, the hood on the automobile and the top of the rear compartment were up, and the injured man was "standing there fixing it."

*Dykes*, a log cutter, was about 52 years old when the incident occurred. He testi-

fied: (a) "There was a car parked up on the pavement in this road, going in the same direction in which the bus was going, and it had no tail lights or head lights, and the night was very dark—and foggy, and he was right on it, the bus was, before it was discovered." (b) He said that another automobile met the bus just before he saw the car parked on the concrete. He saw this parked car after the approaching car passed the bus. "Q. And did the bus driver do anything to miss the car? A. He certainly did. He throwed the bus to the left." (c) He said that there were no lights on the stopped automobile when he saw it (d) He said that it would be pretty hard to say just how close he was to Alexander's car when he first saw it, "it being pretty dark, but it was pretty close." He estimated the distance at 40 feet. He said the bus lights were good but "the fog was hurting the lights." He observed no lights on Alexander's automobile. (e) The stopped car was "over the black mark when the accident occurred." When he got back to the scene of the injury, the sailor had moved it. He wouldn't say that he had seen the bus hit the car, "but I am pretty certain that it did, because I felt the bus give a jolt, like that, like something catching. Q. You mean sideswiped it? A. That is all. It wasn't a center lick at all." (f) The injured person was standing, leaning over, when the bus sideswiped it. Dykes thought that this person was leaning inside the car door; the left door was open, and this person's head was over the seat. Dykes didn't see the hood up. (g) He was there when the sailor left for Kountze, and said that he never did see any lights on the car, tail lights or head lights.

The next two passengers to whom we refer were on the opposite side of the bus, behind the driver.

*Stoker*, a mechanic, was about 35 years old when the incident occurred. He testified: (a) "But the first of my noticing, there was a car coming, going towards * * * that is, the other way, you see, from the way we was coming. And after the car had passed, well, just seen kind of a bulk of something. Of course, it was dark, you know, and running into kind of waves of fog. * * * and by the time this car

had passed that we was meeting, then that bulk of this other car that was up on the highway * * * the bus was so close on him until he had to whip out, you see. The bus was over, went around to the left, understand, and this car looked to me like it was right by or a little over the black mark of the road * * * the highway. And it drove it, drove on by. * * * And so after this bus had gone by the car, one or the other of us and me together * * * I asked, I told the bus driver myself, seemed to me like that hit somebody, maybe we had better stop and see about it. Just like that, and of course the bus driver, he had looked back at the time, you know. He, I figure, had felt the lick or heard it, or something. Well, we parked, and went back up there to where the accident occurred and there was a man lying on the ground there." (b) The automobile that came up like a bulge in front of him was "dead still" and "It was on the concrete." It showed no lights at all. (c) The person who was struck was on the highway when witness first saw him, near the front of the stopped car, and bent over. The hood of the stopped car was up and the left door of the car was opened. It was a one seated car, and witness thought that there was somebody in the back of it. (d) He saw only one person outside of the stopped car when the bus ran by, and thought that he perceived this man when about 50 to 60 feet from him. (e) "Q. Did the bus you were riding on this occasion strike the Ford car in the rear and drive it down the road 15 or 20 feet? A. No, sir. * * * I don't know whether it was the man or the car that was struck but all I knew was the * * * kind of hear a sound, you know. Q. But it didn't drive the car down the road, did it? No, sir." He couldn't say whether the car did or didn't move he didn't see it move. (f) The bus passed the stopped car on the left, cut hard to the left, and witness thought that it went off the pavement. It was turned back on to the pavement, went down the road about 100 feet and stopped. It was subsequently moved off of the "slab." (g) When he first got back to where he could see it, this stopped car was entirely on the pavement; all four wheels. When he had first perceived it, as the bus passed it, some of

the wheels were over the black line in the center, and it was standing still. A man was standing out beside it as if he were working on the motor. (h) The hood of this car was up when the witness got back to the car. (i) Witness didn't know how near he was to the stopped car, when the approaching car passed by. "I never seen the car until the other car (approaching), you know, shined its lights on it." He thought that he was 50 or 60 feet from the stopped car when he first saw it. (j) The bus had good lights; and on a good night, one could have seen ahead a distance of 400 or 500 yards. But this night wasn't good; it was foggy. (k) The bus struck whatever it hit before it went off the pavement on the left. (l) This witness made two trips from the bus to the scene of the accident. He testified: "Q. Did you go back up there to where the man was lying? A. Yes, sir. Q. Was he on the ground? A. No, sir, he was off (on?) the concrete whenever I got back the first time, and then went back up there, he was off. Q. Was he off the concrete when you first got to him? A. He was on the concrete. * * * Q. Was he on the concrete when you first went back? A. He was on the concrete. Q. Was he about the center line? A. Near the center line." (m) On one or the other of his trips, back to the scene of the injury, the sailor got in the stopped car, pulled around the bus, and drove off towards Kountze. The stopped car was "on the highway." The lights on this car were not burning, and witness didn't see them turned on. The hood was down when the car drove off; he didn't know who had lowered it.

*Snowden,* a moulder, was about 71 years old when the incident occurred. He testified: (a) The bus met an approaching car just before the accident. "Well, this car that was coming, I noticed he had extremely bright lights, and the first thing I noticed before the accident happened, just before this car got there, well, *the lights of the bus were on dim.* I thought I saw some one run from the right. Just at that instant the car passed and of course the driver, he had to go over extremely far to the left to miss this automobile which was parked up in the right lane of the road. * * * On the concrete." This car showed no lights.

(b) The first thing that attracted his attention was the approaching bright lights. There were spots of fog along the road that night. He didn't remember whether there was fog at the scene of the injury. "I don't believe there was." When he saw the approaching bright lights, he had not seen Alexander's car. When did he first observe the stopped car, in reference to the approaching lights? "It should have been past the little car because when I noticed the automobile, *the driver, that is what jerked me to attention, caught my attention, * * * is when* he pulled his bus to the left to go around it." The car with bright lights was "somewhere nearly even" with Alexander's car when witness saw Alexander's car. The car with bright lights passed Alexander's car first (and came on toward the bus); "We were close." The bus "cut" to the left. Witness didn't see a man running toward the stopped car: "he was running off the road, he was to the right of the parked car. I mean he ran out away from the road. That is the first object I noticed." This running man was on the right side of the stopped car; he is not the man who was hit. "Q. Did you know he hit this man (injured man) when he (the bus driver) went by? A. No, sir. Q. You didn't feel any lick or jar of any kind? A. We heard a slight noise. Q. Did you feel it yourself in the bus? A. I didn't pay any attention." He is not sure whether the bus struck, or touched, the stopped car; "I don't believe it did. * * * If it did, I didn't notice it and I didn't see the automobile—the parked car, at all." (c) He thought that the bus went down the road 60 or 70 yards before it stopped. "He stopped on the road when he stopped. * * * He was more so on the right" (d) When the bus driver cut to the left, he cut suddenly to the left; "When he went around the automobile." He didn't know whether the bus went "clear off" the pavement. "I didn't pay any attention * * * excited me when I saw the automobile." (e) "Q. Did you ever see the man that got hit before he actually got hit? A. Just a glimpse as we passed the automobile. "This man was "along the bottom where the hinges are on the front door, where they should be when open, and along the front fender." "Seemed to be working under the hood." But witness couldn't tell whether the hood was up or not. (f) "Q. And when you got off—and went back there, you and the bus driver and whichever one of you all went together, what was the first thing you saw with reference to these folks there, any of the people in the car? A. Well, part of them came running down to where the bus was stopped and this sailor got in this automobile and pulled out and that was the first reaction I saw." He was not sure but thought that the man who left in the automobile didn't turn on his lights and drive off with the lights burning. He didn't see this man lower the hood. (g) When he first saw the injured man as he went back to the scene from the bus, this man was "sitting up at the edge of the slab. * * * I don't remember whether he was off or on the slab, just remember along the edge of the road." It seems that shortly after, a woman sat down and put this man's head in her lap.

All of these four passengers testified that the bus was moving at a moderate speed when it struck the injured man; estimates varied from 25 to 35 miles per hour. However, the only person who could have known the exact speed of the bus, namely, the bus driver, was not asked to testify to the speed of the bus and he gave testimony indicating that the bus was moving at high speed. He testified that the bus left Woodville about 11:20 or 11:30 o'clock. He testified further that the collision occurred about 11:45 o'clock. Further: "Q. We will say between 11:00 and 12:00 o'clock and know that that is right? A. Yes, sir." Further, he thought that the incident occurred "about 16 or 18 miles" from Woodville. "Q. Anyhow between 15 and 20 miles? A. Yes, sir, something like that." There was other testimony that the incident occurred about 20 miles from Woodville. Application of the time the bus required to travel the distance from Woodville to the scene of the injury shows that the bus probably traveled at a much higher rate of speed (perhaps as high as 60 miles per hour) than the bus passengers thought that it did. This of course is in accord with Alexander's theory of the facts.

Having noted this conflict, it will be appropriate here to refer to and list the ma-

terial conflicts and uncertainties appearing thus far in Insured's evidence. (1) We have just noted one, that concerning the speed of the bus. (2) Another is that concerning the intensity of the light cast by the head lamps of the bus. Snowden testified that the light cast by these lamps was dim. "Well, this car that was coming, I noticed he had extremely bright lights, and the first thing I noticed before the accident happened, just before this car got there, the lights of the bus were *on dim.*" He thought that there was no fog at the scene of the injury but said he didn't remember. The testimony of the driver and of the other three passengers shows that the headlamps of the bus were burning brightly. Two of them, Dykes and Stoker, referred to fog, but it is not clear that they meant to say that the scene of the injury was foggy—instead, only along the road, as Snowden said. The driver and Baxter made no reference to fog. It may be that Snowden's quoted statement should be construed as referring to the shortness rather than the intensity of the beam, but the effect upon Insured's proof was the same; either construction limits the driver's field of view. (3) There was a conflict regarding the position of the stopped automobile upon the pavement. The bus driver put Alexander's automobile near the right side of the pavement. Baxter said that the injured man was practically in the center of the pavement. Dykes and Stoker put Alexander's automobile over the black line running down the center of the pavement, and Snowden didn't testify regarding the matter. (4) The three conflicts just referred to aggravate some uncertainties appearing in Insured's evidence. These relate to the intensity of the light case by the headlamps of the approaching automobile, and the effect of this light upon the bus driver. According to the driver, these lights obscured Alexander's automobile and caused him to collide with Alexander. Only one passenger, Baxter, testified that the light emitted by these lamps affected him; he said that it "bothered" him. Snowden, sitting on the opposite side of the bus, behind the driver, said that this light was "extremely bright." Later he answered affirmatively a question on cross-

examination inquiring if the head lamps were "pretty bright lights." However, the other two passengers, Dykes and Stoker, did not refer to these lights and each of them was as well placed for observation as were Baxter and Snowden; Dykes was Baxter's seat mate, and Stoker sat behind, but near the driver as did Snowden. Regarding the effect of the lights upon the visibility of the stopped automobile to the passengers there is the same uncertainty. Baxter first said that he saw this automobile just as the approaching car passed the bus, as the driver testified, but on cross examination he testified in effect that the lights of the approaching car revealed the stopped automobile to him. "Q. In other words, you saw the little Ford that the people were in, just before the bright lights passed it? A. Yes, sir." Dykes (Baxter's seatmate), who did not refer to the intensity of the light emitted from the approaching car, said that he did not see the stopped automobile until *"after* the car passed us." He also said that the bus had good lights, but that "the fog was dimming the lights on the bus," and that the night was "pretty dark." Stoker, on the opposite side of the bus, behind the driver, said on direct examination that he saw the stopped automobile *after* the approaching car had passed. He did not refer to the intensity of the light from the approaching car; he testified: "And after the car had passed, well, just seen kind of a bulk of something. Of course, it was dark, you know and running into kind of waves of fog. * * * And kind of waves of fog, and by the time this car had passed that we was meeting, then that bulk of this other car that was up on the highway * * * the bus was so close on him until he had to whip out, you see." Yet he, too, on cross examination said that the light from the approaching car first revealed the stopped automobile to him. "Q. Now, then, when this other car passed * * * the one you claim you saw meeting it *. * * how close were you all to the little Riley car the boy was hurt in, when the other car passed by, coming toward you? A. I don't know. I never seen the car until the other car, you know, shined its light on it. Q. Until What? A. Until the other car shined its

light on it. Q. Which other car? · A. The one we was meeting. Q. How close were you all to it when you first saw the Riley car, we will call it? A. Oh, I judge around fifty or sixty feet, something. Q. How fast were you all driving then? A. I suppose around twenty-five or thirty-five miles an hour." Snowden testified on cross examination: "Q. When you saw this car coming with the bright lights, meeting you, had you seen the other * * * we will call it the little car, the Alexander car? A. No, sir. * * * Q. This bright light car up the road * * * did it get even with it, past it, or * * * A. It should have been past the little car because when I noticed the automobile, the driver, that is what jerked me to attention. Caught my attention * * * is when he pulled his bus to the left to go around it. Q. * * * Had this bright light car got even with this Alexander car? When you first saw the car? A. Somewhere nearly even." There is evidence here from Insured's witnesses which tends to prove that the intensity of the light from the approaching automobile was not a cause of the collision between the bus and Alexander. (5) There are other striking conflicts among Insured's witnesses. One arose as to what the bus did to Alexander's automobile. Baxter said that the bus hit the automobile, and further, that the blow drove the automobile down the road 15 or 20 feet. No other witness was willing to testify that the bus struck the automobile at all. The driver only said that he struck a man. Dykes, Baxter's seatmate, said: "I wouldn't say I seen it hit it, but I am pretty certain that it did, because I felt the bus give a jolt, like that, like something catching. Q. You mean it sideswiped it? A. That is all. It wasn't a center lick at all." Stoker flatly contradicted Baxter's statement that the automobile was driven down the road. He did not know whether the bus did or did not touch the automobile; he "kind of heard a sound, you know." There are various details among his testimony which are inconsistent with Baxter's statement (the hood of the automobile was up when he got back to it; the automobile was yet on the pavement; the bus turned sharply to the left and, he thought, went off the

pavement). Snowden said that he heard a slight noise. He was not sure, but thought that the bus did not hit the automobile. (6) There was another conflict as to whether the bus carried Alexander's body down the road. Baxter said that the bus carried the injured man down the road "a little piece," and threw him off on the right hand side, 10 or 15 feet from the pavement, and that he found Alexander there when he got back to the scene of the injury. He professed to have been the first man off the bus. This testimony goes beyond even Alexander's theory, and it is inconsistent with the testimony of Insured's other witnesses. The driver denied that the injured man was carried forward on his bus, and said that the man was on the shoulder, about 4 feet off the pavement, when he got back to the scene. Dykes said only that when he got back to the scene, the Walters girl was sitting down with the injured man's head on her lap. He went back with Baxter and the driver. Stoker, who made two trips to the scene of the injury, testified: "Q. Was he off the concrete when you first got to him? A. He was on the concrete. Q. Then he wasn't laying 10 or 15 feet off the concrete when the bus driver first went up there? A. No, sir, he was on the concrete. * * * Near the center line." It appears from his testimony that later, he saw the girl holding the injured man's head in her lap. Snowden said that when he got back to the scene of the injury, the injured man was sitting up at the edge of the pavement, whether on or off the pavement he did not recall. Later, this man lay down and put his head in the lap of a girl there.

The last two conflicts noted reveal circumstances impeaching Baxter's credibility. Some of Snowden's evidence quoted above tends to impeach his (that is, Snowden's) version of the incident. Snowden testified on cross-examination: "It (the approaching automobile) should have been past the little car because when I noticed the (stopped) automobile, the driver, that is what jerked me to attention. Caught my attention * * * is when he pulled his bus to the left to go around it." Further: "Q Did the bus itself strike the little parked car at all? touch the car at all? Your bus? A. Well, I am not sure. I

don't believe it did. Q. Yes? A. If it did, I didn't notice it and I didn't see the automobile. Q. Yes. A. The parked car at all." Such statements show that he had little opportunity to observe what occurred.

The theory of how the incident occurred expressed by the foregoing testimony of the driver and of the four passengers represented the only real defense made in behalf of Insured. However, a considerable amount of evidence, to which we shall now refer, was also adduced, tending to show that the people in Alexander's automobile, or some of them, had been drinking whiskey shortly before the bus struck Alexander. As we read it, this evidence proved no defense to Alexander's action, and harmed Insured's defense more than it helped. Alexander's witnesses contradicted this proof, and on rebuttal, Alexander countered it by the testimony of the boy Myrlen Creel, apparently a competent and unbiased witness, and the testimony of Insured's witnesses Baxter and Dykes exhibited circumstances seriously impeaching both of them.

Of the witnesses, testifying in behalf of Insured, only the passengers referred to evidence of drinking by the occupants of Alexander's car, and of these passengers, only Baxter and Dykes gave specific detailed testimony. The driver, who was present on the scene until Alexander was removed, never referred to any evidence of drinking. He did testify: "Q. Did you get out and go back to the car? A. Yes, sir. I went back to the accident. Q. Do you claim you found any whiskey bottles in it? A. No, sir. Q. Did you see any bottles of any kind around it? A. No, sir, I didn't." Baxter testified in detail. On direct examination he said that when he went back to the scene of the injury, he heard the people in the bus cursed by the boys and by the girls. "Q. Were they drunk or sober? A. They were drunk. Q. How could you tell it? A. Smell it." On cross examination he testified: (a) "Q. Did you smell any whiskey? A. I did. Q. Who did you smell it on? A. Girls and boys." (b) "Q. How many people did you smell intoxicating liquor on? A. All them boys and one of the girls. Q. All of the boys. You say there were seven in

the car? A. Yes, sir. Q. Do you know how many there was? A. There was seven of them." There were five boys. "Q. You smelled liquor on all five of the boys? A. Yes, sir. Q. That included the man that was hurt? A. Yes, sir. Q. You smelled liquor on one of the girls? A. Yes, sir. Q. Did you see any bottles or containers for liquor or beer? A. Yes, sir—I seen one—Laying right behind that Walters girl. She was sitting down holding that man's head in her lap." The impeaching circumstances to which we referred—indicating an apparent willingness by Baxter to testify positively to matters which he did not know—were as follows: (a) No other witness saw a bottle, and since the evidence on the point shows that the night was dark, it is somewhat surprising that Baxter saw one. (b) Baxter said that he smelled liquor on all five of the boys; this includes the injured man and the sailor Lilley. Yet he also testified that he did not touch the injured man, did not help put him in the ambulance, and that he approached the injured man no closer than "something like" six or eight feet, when the injured man was on the ground and he, the witness, was standing up. Concerning the sailor, he said it "wasn't but over five minutes" after the injured man was hit, before this person departed in the car. And further: "Q. And the boy in the Navy uniform got in the car and left there pretty quick? A. Yes, sir."

Dykes also testified in detail. He referred to some profanity by the sailor and by one of the girls. On direct examination, he said: (a) "I am not certain, now, whether * * * just which one of those people made this expression * * * whether it was the Moss boy or the Walters boy * * * it was this boy that was a sailor boy, said, 'Get that damn car and whiskey away from here.' Q. Did you, yourself, see or find a bottle around there? Afterward? A. I most certainly did * * * a pint bottle, about half full of whiskey. Q. Where was it? A. Right behind this Walters girl. Q. What did you do with it? A. I picked it up and put it in my pocket. I didn't say anything about it to anyone. I kept it about a space of two weeks, expecting something to hap-

pen in the courts, and it didn't. And I got up one morning and drank the whiskey. Q. Now did you smell any liquor on anybody's breath then, that night? A. I certainly did. Q. On whose breath did you smell it? A. Everyone of them except Lola Teel. Her breath smelt like she had drank beer. Q. Did you ask her what she was doing? Or anything about that? A. I sure did. Q. What did she say? A. Said they were out honky tonking." On cross examination he again related his discovery of the whiskey bottle. "Q. Where was it? A. Right behind this Walters girl, on the ground, and I got through dressing the boy (according to him he had procured the bus driver's first aid kit and administered first aid to the injured man) I sit on the ground by her and put my hand back and my hand comes in contact with the bottle and I took it off of it, and I picked it up, and I could tell there was something in it. And I put it in my pocket. Q. You have since then drunk it? A. I sure did. Q. You didn't save the bottle? A. No, sir. Q. Where was the bus driver at that time? A.—he was sort of like all the rest, standing up there just * * * you know * * * wondering how bad serious the accident was. * * * Standing in front of me.—I might have touched him, by reaching up and touching him, but I was sitting down, and he was standing up. He was about three feet from me. Q. Did the bus driver see you pick up the bottle? A. No, sir. Q. Didn't any one see you pick it up? A. No, sir, and I didn't tell anyone I had picked it up."

No other witness testified to hearing such a remark as Dykes charged to the sailor Lilley.

The other two passengers, Stoker and Snowden, gave very general testimony about drinking. Both testified to hearing some profanity. Stoker testified further on direct examination: "Q. From what you saw of the people, in your opinion, had they been drinking or not? A. Well, if I am any judge, they was, because I could smell liquor." On cross examination he testified: "Q. Did you smell whiskey on the sailor's breath? A. Well, I don't know whose breath it was on, it was all around.

Q. Did you smell liquor on the injured man's breath? A. Well, it was either his breath or the girl's breath, one. I couldn't say." Snowden testified on direct examination (after referring to some profanity) as follows: "Q. In your opinion were the people drinking or not? A. Well, the reaction of them seemed they would be, the reaction, and you could smell it but I didn't see any. Q. You didn't see any bottles or any liquor? A. No, sir." On cross examination he testified: "Q. Did you smell any liquor on the sailor's breath? A. I didn't get close to the sailor, sir." He did not see a bottle of any kind.

In rebuttal, Alexander adduced the testimony of Myrlen Creel. This witness was a boy about 16 or 17 years old when Alexander was hurt. He lived with his grandfather near the place where the injury occurred, and on the night in question, came upon the scene of the injury on his way home from a movie in the town of Warren, some distance down the road towards Woodville. Exactly when he arrived at the scene is not clear; it was after Lilley departed for Kountze, but evidently not long after. He said that he remained at the scene for 30 minutes or an hour and helped put the injured man in the ambulance. According to some of the testimony, this was about the period intervening between the collision and the arrival of the ambulance. Myrlen Creel said that he heard some cursing; "The bus driver refused to take the bus and move him to a doctor and he started cursing. He didn't curse at no individual one, I believe." He heard no cursing from the girls. He was about and among all of these people for the period of time stated, and he observed no evidence of drinking. "Q. Son, in handling this man and helping load him in the ambulance, I will ask you whether or not you smelled any intoxicating liquor of any kind on him? A. I don't believe I did. Q. Did you smell any on any of the people there with him? the women or boys? A No. sir. * * * Q. * * * Did you see any whiskey bottles or any bottles with intoxicating liquors in them of any kind around there? A. No, sir."

The most obvious criticism which can be made of the testimony concerning drinking

by people in Alexander's automobile is that it proved nothing material. From the testimony of Insured's witnesses it cannot be inferred that the drinking, if any there was, was a cause of the collision between the bus and Alexander; this testimony affords a basis for nothing but speculation. Further, it was countered by the failure of the driver—who was on the scene until the ambulance departed with the injured man—to refer to the matter and by the testimony of Creel. Further, it may be said that the testimony of Stoker and Snowden is not only general; it expresses their opinion, founded in part upon conduct (the cursing) of which they did not approve. And finally, as regards Baxter and Dykes, it contains impeaching evidence of the most serious kind.

There is another conflict in Insured's testimony to which we may now refer. It was between Dykes and Baxter. Dykes testified that he and Baxter spent the night before the injury, the night of April 12th, in Beaumont at the Stella Boss Hotel, and he did not remember whether they registered there or not. At the close of Insured's evidence, Insured's witness Baxter took the stand as a witness in behalf of Alexander and testified that he had never spent a night in any hotel with Dykes. He said that he spent the night of April 12th at home, and that he met Dykes in Kountze on the following morning; and with his testimony this phase of the inquiry closed.

Finally, there was another circumstance affecting the weight of Baxter's testimony, which was necessarily aggravated by all that has been heretofore said of this witness. There was actually some evidence that Baxter was not on the bus when the incident occurred. He said that he was, and Dykes said that he was. However, in March, 1944, about three months before Alexander's case was tried, the bus driver wrote a letter which was introduced in evidence, purporting to list the names and addresses of *all* of the passengers on the bus, and Baxter's name was not listed. Yet the driver unquestionably undertook to procure the names and addresses of his passengers, and those he listed were all accounted for on trial. Three of them, Dykes, Stoker and Snowden, testified. The other two were shown with reasonable certainty to be Negroes. The driver testified first that there were "about five" passengers. Later he testified: "Q. And how many passengers did you say you had? A. Five passengers." Baxter, of course, made six passengers, not five. Baxter, himself, said that he could not read, that his companion Dykes wrote down his name and address and gave it to the driver. The driver did not refer to this matter, and the passengers other than Dykes were unable to give any information on the point.

(3) There was evidence that the offers of settlement were made by Alexander's counsel because Alexander was in need of funds. One of Alexander's counsel testified: "Q. When you were attempting to negotiate this settlement were you in good faith in desiring to settle the litigation? A. Absolutely. Our client was in urgent need of some money and encouraging us to settle it if we could, and that was our reason for trying to settle." Another counsel for Alexander testified concerning the offers of settlement: "I feel sure that I told him we would take or would recommend $4500. That is my very best recollection about it because I was trying to make it within the policy and I understood the policy was $5,000." On the other hand it was not shown that this motive for settlement was communicated to the counsel then representing Insured and there is some evidence that Insured's counsel construed the offers of settlement as a confession of weakness. Of course, whether they were justified in so construing it depended ultimately upon the proof made on the trial. One of Insured's counsel in Alexander's case testified that after the introduction of evidence had ended one of Alexander's lawyers (there were 4 of these lawyers and the one referred to was not Alexander's chief counsel) expressed the opinion, in response to counsel's inquiry, that Alexander would win but would not get a large verdict. Counsel testified: "I asked him how the case was going to come out, what he thought the verdict would be —as I usually do in most cases. He said, Well, I think we will win it but I don't think the verdict will exceed $5,000 because we have got a man on the jury, a

juror—I think he said his name was Crosby, I am not sure about that—who is a very tight, conservative fellow, and a dollar looks as big as a wagon wheel to him and we made a mistake in letting him get on the jury and I don't think, there will be a verdict over $5,000, but he was positive in his statement he thought they would win."

Points of Error 1, 2 and 3 raise Insurer's main ground for reversal of the judgment appealed from, namely, that the finding that Insurer was negligent in rejecting Alexander's offers to compromise and settle his action is not supported by the evidence. These Points are overruled for reasons now to be stated.

■ (1) As we have said, the insurance policy and the attendant circumstances made applicable to Insurer, in behalf. of Insured, the duty of care declared in G. A. Stowers Furniture Co. v. American Indemnity Co., Tex.Com.App., 15 S.W.2d 544, 547. The Commission of Appeals, in that decision, described that duty in the follwing terms: "The provisions of the policy giving the indemnity company absolute and complete control of the litigation, as a matter of law, carried with it a corresponding duty and obligation, on the part of the indemnity company, to exercise that degree of care that a person of ordinary care and prudence would exercise under the same or similar circumstances, and a failure to exercise such care and prudence would be *negligence* on the part of the indemnity company."

The *degree of care* required of Insurer was further described in these terms: "* * * where an insurance company makes such a contract; it, by the very terms of the contract, assumed the responsibility to act as the exclusive and absolute agent of the assured in all matters pertaining to the questions in litigation, and, as such agent, it ought to be held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and (the agent?) failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages." The Commission said further: "* * * the correct rule under the provisions of this policy is that the indemnity company is held to that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business."

Thus the wrong for which Insurer is liable, if at all, is a tort, in negligence, and the standard of conduct to be followed by Insurer is *due care*. This is not the same standard of conduct as exists in those jurisdictions which profess to determine by Insurer's *good faith* Insurer's liability for rejecting offers of settlement. *Good faith* apparently implies no more than an absence of, an improper motive and some basis in reason for Insurer's act; and a comparison of this standard with that declared in the quotations above shows that the standard of conduct governing Insurer in Texas is much stricter than is the standard of *good faith*. Consequently, we cannot determine Insurer's liability on this appeal by judgments arrived at in jurisdictions which would require no more than *good faith* from Insurer. Insurer says this of the opinion in the Stowers Furniture Company case: "It is likewise plain from the language of the opinion that the court used the term 'negligence' as synonymous with 'bad faith.'" We do not so construe the opinion; had the Commission meant "bad faith" instead of "negligence" they would have used the words "bad faith" instead of "negligence" and they would not have said three times, as they did in the quotations made above, that *due care* was the standard of conduct for Insurer. Nor need they have held, as they did, that the injuries suffered by the person who sued the Furniture Company was relevant "on the question of negligence on the part of the indemnity company in failing and refusing to make the settlement." We think it apparent from the opinion of the Court of Civil Appeals [295 S.W. 257] and from that of the Commission that the Commission meant to repudiate *good faith* as a standard and to adopt instead the stricter standard of *due care*. The liability of the

insurer in the Stowers Furniture Company case was eventually determined in favor of the insured by a jury finding of negligence. See: American Indemnity Co. v. G. A. Stowers Furniture Co., Tex.Civ. App., 39 S.W.2d 956.

(2) Insurer's liability being in negligence, and the standard of conduct being defined as *due care,* the question, whether Insurer did or did not comply with this standard in rejecting Alexander's offers was one of fact; and since the present action was tried before a jury, that question had to be submitted to the jury (as was done) for their decision if there was room for a difference of opinion as to what Insurer should have done. If the evidence afforded no basis for a difference of opinion, the trial court should have instructed a verdict, according to what was proved. These are the usual rules defining the province of judge and jury, and must be applied to the question now before us, as they are to other questions of fact. Our jurisdiction is limited to determining whether there is any evidence to support the jury's finding.

(3) Thus the standard declared by the Commission is an external standard; that Insurer's officers and agents believed the course of action adopted by them was the best, and that they had some basis for their opinion, will not defeat Insured's actions. Their good faith, or rather, the ground therefor, is but a circumstance relevant to the issue of negligence, and whether they exercised due care or not is a matter to be re-examined and re-determined by the trier of facts sitting on the second trial—the trial of this action—just as occurs in other actions for negligence. That Insurer had the benefit of counsel is also not controlling. Whether Alexander's offers should be accepted was a matter for the authorized and responsible officer of Insurer to decide; that he had the benefit of the opinion of the lawyers defending Insured is only a circumstance bearing on the issue of negligence and the standard of care required of lawyers has nothing to do with the case before us as was in effect held in American Indemnity Co. v. G. A. Stowers Furniture Co., Tex.Civ.App., 39 S.W.2d 956. To hold otherwise would abrogate the standard of conduct expressed in the quotations above.

(4) Whether Insurer breached the applicable standard of conduct is not easy to determine; determination of such an issue requires an exceedingly precise evaluation of evidence.

Only *due care* is required of Insurer, and therefore we agree with Insurer that Insurer did not become liable to Insured merely because the decision to reject Alexander's offers proved to be wrong. *Due care* leaves room for an error of judgment, without liability necessarily resulting.

Further, it must be said that the single fact that Alexander's proof made out a prima facie case of liability against Insured did not automatically and as a matter of law subject Insurer to liability (under the applicable standard of conduct) for rejecting Alexander's offers. To hold otherwise would deprive Insurer of all discretion and would, in effect, require more than *due care* of Insurer; for *due care,* leaving room for simple errors of judgment, necessarily vests Insurer with a right to decide, and such a right implies some discretion.

(5) It must also be said in behalf of Insurer that all of the material circumstances which Insurer rightfully considered in determining to reject Alexander's offers could not be reproduced upon the trial of the present action. We refer to the demeanor and conduct of the witnesses and of the jury, the atmosphere of the trial, etc. However, this difficulty exists to some extent under the *good faith* standard.

(6) Under the circumstances, then, we shall be justified in requiring of Insured a strict compliance with the burden of proof. However, we can make no greater demand of Insured for, as we have stated, the fact that room for a difference of opinion exists eventually makes the question one for the jury, not for this court.

(7) Upon a consideration of the evidence before us, we note the following:

First: The question posed requires a re-examination of an exercise of judgment

by Insurer and of nothing more. Insured does not say that Insurer was influenced by an improper motive nor that Insurer conducted the defense of Alexander's action improperly or failed to properly prepare for trial. That the question was of this character was, of course, no defense to Insurer, since it was precisely that sort of question which was involved in the two Stowers Furniture Company appeals. See: Tex.Com.App., 15 S.W.2d 544 and Tex.Civ.App., 39 S.W.2d 956. We note that Insurer had only to weigh evidence, not law.

Second: Insurer's opportunity for considering Alexander's offers was adequate and Insurer's knowledge of all material circumstances was complete. Indeed, the opportunity was as good as Insurer could ever have, for it was last made after all of the evidence had been introduced on a trial of the merits of the claim asserted against the Insured. Insurer did not act under the pressure of necessity; Insurer was not deprived of the opportunity of rejection.

Third: The issue of damages was not contested; Riley Alexander and his wife were confirmed by an experienced and unimpeached physician, and if liability was found against Insured, a verdict in excess of the policy limit could reasonably have been anticipated. There is no room in the evidence for a low damage verdict; if if Riley Alexander was entitled to anything he was entitled to heavy damages.

This circumstance was relevant to the issue of negligence. In the Stowers case the Commission said, of the person who sued the Furniture Company [15 S.W.2d 548]: "* * * we are of the opinion that the serious nature of Miss Bichon's injuries and all the facts and circumstances surrounding her injury, are material as bearing on the question of negligence on the part of the indemnity company in failing and refusing to make the settlement."

Fourth: The issue of liability was vigorously contested in Insured's behalf, but the proof made by Alexander was consistent while that of Insured's witnesses contained the several material conflicts and uncertainties hereinbefore discussed, and the testimony of at least three of the passengers, Baxter, Dykes and Snowden was subject to criticism. It can be said that Baxter was discredited and that Dykes was seriously impeached; and of the various passengers, these two were the best situated to observe what happened and the cause of the collision between bus and injured man. The driver of Insured's bus was in some sense an interested witness—as was Lilley, Alexander's brother-in-law, and as was Alexander himself.

It seems to us that there is proof in these matters tending to show that the jury sitting on the trial of Alexander's case was more likely to find that Insured was liable to Alexander than that Insured was not, and thus, that a judgment against Insured in excess of the policy limit was more likely than any other.

Under these circumstances, would an ordinarily prudent person, in the position of Insured, in the exercise of that care which he employed in the management of his own business, have accepted Alexander's offer to settle for $4,500, rather than take the chance of being charged with a substantially larger verdict? We think the matter was for the jury.

(9) It was not a defense to Insurer that Insured did not demand acceptance of Alexander's offers. Insurer must perform the duty imposed upon it without being activated by Insured. Insurer had notice of the consequences which would result to Insured if Alexander's offers were improperly rejected.

(10) Our judgment is based upon the particular record before us. Each case of this sort must necessarily be determined upon the facts peculiar to the case.

We may now consider the remainder of Insurer's Points of Error.

In Point 7, Insurer says that the Special Issue submitted did not embody the true test of Insurer's liability, which is said to be, whether a judgment for Alexander in excess of $5,000 should have been anticipated, etc. In Point 5, Insurer says that the judgment appealed from is not supported by the verdict because there is no finding that a judgment for Alexander exceeding $5,000 should have been anticipated. And

in Point 4 Insurer says that the Special Issue submitted was an evidentiary issue, apparently because it did not embody the test referred to in Point 7.

■ Points 4, 5 and 7 are overruled. The ultimate question of fact was whether Insurer was negligent in rejecting Alexander's offers, not whether a verdict for Alexander in excess of $5,000 should have been anticipated, and a realistic interpretation of the Special Issue shows that this ultimate question of fact was expressed in the Special Issue submitted. On the record the jury's finding convicts the Insurer of negligence and other relevant facts were undisputed. The test of Insurer's liability is the adopted standard of care, and the Special Issue submitted embodies a definition made of this standard by the Commission of Appeals. Thus the Special Issue submitted is good against the objections referred to in these Points, for it was ultimate in form and embodied an approved definition of the standard of care, and the trial court's judgment thus has support in the verdict. Whether a verdict for Alexander in excess of $5,000 ought to have been anticipated was a matter to be considered in determining whether the offers of settlement should have been accepted, but Insurer's objection, if one could be made, would seem to be that the charge was not specific enough to clearly tell the jury what they were to consider. We do not understand that this is the nature of Insurer's objection to the charge. We note, from Insured's brief, that the Special Issue submitted is like that used in the retrial of the Stowers case.

In Point 6 Insurer says that the Special Issue submitted is not supported by the pleadings. This Point is overruled. Paragraph 14 of Insured's petition supports the Issue, if the balance of that pleading does not.

■ Point 8 assigns error to the refusal of a requested Special Issue embodying this definition of the standard of care: " * * * a person of ordinary prudence in the exercise of that degree of care which such a person would use in the management of his own affairs *and litigation, and who did not carry any insurance.*" The words underlined refer to matters not specifically referred to in the Special Issue submitted to the jury.

Point 8 is overruled. The essence of this Point seems to be that the Special Issue submitted cast too heavy a burden on Insurer because it did not tell the jury that in determining whether a person of ordinary prudence would have accepted Alexander's offers, they must assume that this hypothetical person did not carry liability insurance—to prevent the jury's answering the Issue in behalf of Insured on the theory that a man with liability insurance would settle a case when one without such insurance would not.

There is nothing in the evidence to require such a refinement of the charge. Under the policy in proof Insurer was not liable for settlements made without Insurer's consent; and the jury could hardly have understood that they were to return a verdict on the theory that the hypothetical person of ordinary prudence was going to pay the settlement with some other person's money.

■ Point 9 reads: "It was error for the trial court to refuse to instruct the jury, as requested by appellant, that they would not give any consideration to the fact that the jury in the Riley Alexander case returned the verdict which they did return, but would consider only the facts and circumstances known to appellant and its attorneys prior to the return of such verdict."

Point 9 is overruled. The requested instruction would only have repeated matter already expressed in the charge; the inquiry stated in the Special Issue submitted referred directly, and only referred, to matters prior to verdict, and the form of this Issue, impliedly but plainly, told the jury what the requested instruction would have told them. Repetition would have added nothing but emphasis; the necessity for this emphasis is not apparent.

■ Points 10, 11 and 12 assign error to an argument of Insured's counsel. We are not satisfied that the argument was subject to the objection actually made in the trial court or that it was improper when viewed as a part of the entire argument quoted in the bill of exceptions; but if error was committed, we think it was

harmless. The facts which Insured's counsel told the jury were already in proof before them—necessarily so. The argument was of little force; what if the verdict on Alexander's trial was in favor of Alexander? Does this imply that Insurer ought to have anticipated such findings? or refused to take a chance? A conscientious juror would have realized from counsel's statement the difficulty Insurer was under of reproducing all of the factors which influenced the decision concerning Alexander's offers, and would have viewed Insured's proof more strictly.

Point 13 is overruled. Insurer did not tender the full amount due. We assume that this Point was filed as an incident of Insurer's argument that only the sums contracted to be paid in the policy were owing.

The comments dispose of all Points of Error filed on this appeal. The judgment of the trial court is accordingly affirmed.

## On Rehearing.

We have the following comments to make regarding Insurer's motion for rehearing:

(1) The Commission's description (in Stowers Furn. Co. v. American Indemnity Co., 15 S.W.2d 544, 547) of Insurer's relation to Insured shows that the Commission rejected *good faith* as the test of Insurer's liability in such a case as this. For the Commission said that the Insurer before them "by the very terms of the contract, assumed the responsibility to act as the exclusive and absolute *agent* of the assured in all matters pertaining to the questions in litigation, and, as such *agent*, it ought to be held to that degree of care and diligence which an ordinary prudent person would exercise in the management of his own business."

In likening the Insurer to an agent, bound to satisfy the standard of care stated, the Commission obviously had in mind the rule of decision in this State whereby an agent is held liable to his principal for negligence (over and above bad faith) in conducting his principal's affairs. Thus in Williams v. O'Daniels, 35 Tex. 542, after concluding that the defendant was to be treated as an agent, the court held: "With this view of the law of the case, we think

the court did not err in the charges given to the jury, and especially—wherein the jury were instructed 'that if, in the exercise of sound discretion, defendant used such diligence and care as a prudent man would have used with his own cotton, he would not be liable for its subsequent loss.'" In Murrah v. Brichta, Tex.Sup., 9 S.W. 185, the agent, a layman who undertook to lend plaintiff's money upon adequate security, was held liable for negligence regarding a settled point of law, his negligence having resulted in loss to his principal. Section 379 (Sub-sec. 1) of the Restatement of Agency reads: "Unless otherwise agreed, a paid agent is subject to a duty to the principal to act with standard care and with the skill which is standard in the locality for the kind of work which he is employed to perform, and in addition, to exercise any special skill that he has." And in Comment (c), page 840 it is said: "The rules stated in the Restatement of Torts defining the standard of conduct which must be maintained to prevent conduct from being negligent are applicable, except so far as the agent, because of undertaking work involving superior knowledge or skill, is required to meet a higher standard." The decisions cited above and those now to be listed show that the courts of this State, in determining an agent's liability for negligence, have not been governed by the agent's *good faith*. They have, instead, inquired whether the agent had complied with the legal standard of conduct. See the following decisions: Van Velzer v. Houston Land & Trust Co., Tex.Civ.App., 16 S.W.2d 865; Yarborough v. Fulton, Tex. Civ.App., 78 S.W.2d 247, at page 250; Blondeau v. Sommer, Tex.Civ.App., 99 S.W.2d 668; 2 Tex.Jur. 601 (Sec. 188).

We adhere to our conclusion that *due care* and not *good faith* is the test of Insurer's liability.

(2) Paragraphs 21 and 17 of the motion of rehearing express the argument that the question, whether Riley Alexander's offer to settle should be accepted, was solvable only by a lawyer, and that our judgment necessarily implies a holding that the two lawyers who represented Insured on the trial of Alexander's case were guilty of malpractice in advising that Alexander's

offer be refused. Further: (from paragraph 17) "Since appellant's lawyer was at most only guilty of an honest mistake of judgment as to the course of the litigation, he could not be held guilty of malpractice or breach of any duty to appellant."

■ It seems to us that a lawyer's *good faith* in representing his client does not necessarily determine whether he is liable in damages to a client who has suffered injury from his acts. See: 5 Tex.Jur., 468, et seq., Sections 60, 61 and 62.

However, whether the lawyers who defended Insured and who advised Insurer not to accept Alexander's offer of settlement were, or were not, liable to Insured is not material.

If these lawyers are not to be treated as Insurer's agents, then at the bottom of the argument made in paragraphs 21 and 17 is a proposition that Insurer had the absolute right to follow the *opinion* of these lawyers, and that Insurer need not make inquiry concerning the grounds of that opinion, nor form any independent judgment concerning the grounds of that opinion.

This would reduce Insurer's obligation to the employment of competent lawyers to defend Insured, and would abrogate the duty and the standard of care imposed upon Insurer by the Commission's opinion in the Stowers case.

The result of such a conclusion is but to shift to the lawyers defending Insured a responsibility which actually rests upon Insurer. For its own purposes, and in return for a compensation which presumably bore some relation to the total risk run, Insurer assumed control of Insured's defense; and the responsibility incidental to that control must remain with Insurer.

■ If the lawyers are to be treated as agents of Insurer, we note that regarding the liability of an agent for a sub-agent's acts, Section 406 of the Restatement of Agency states: "Unless otherwise agreed, an agent is as responsible to the principal for the conduct of a sub-agent with reference to the principal's affairs intrusted to the sub-agent *as the agent is for his own conduct;* and as to other matters, as a principal is for the conduct of an agent." Comment (b) under Section 406 states: "Since the agent is the sub-agent's principal and, as between himself and the ultimate principal, is primarily responsible for the subagent's conduct, he is as liable to the ultimate principal as is any other principal for the conduct of an agent. Thus, he is subject to liability to the principal for damages caused to the principal by the negligence of the subagent in conducting the affairs of the principal, or for his misrepresentations because of which the principal is made liable or because of which a contract is avoided."

Responsibility for Insured's defense rested upon Insurer not upon Insurer's agents. The judgment which was to be formed in determining whether Insurer would accept Alexander's offer was Insurer's judgment, not the judgment of the lawyers who defended Insured and advised Insurer; and the authorized and responsible officer of Insurer, whose duty it was to form Insurer's judgment was charged with the necessity of exercising some degree of independence in forming that judgment. That this may have required some knowledge of the law is no defense to Insurer; instead, it simply put Insurer to the burden of seeing that this officer had the requisite knowledge.

This, of course, brings us back to the duty and the standard of care declared in G. A. Stowers Furniture Co. v. American Indemnity Co., Tex.Com.App., 15 S.W.2d 544. We adhere to our conclusion that the evidence supports the jury's findings.